**INEOS GROUP LTD., Ineos Technologies, Ineos Americas LLC, Ineos Manufacturing Belgium NV, Ineos LLC, Ineos Europe Limited, Ineos Polyethylene North America, Ineos USA LLC, and Ineos Olefins, LP, Appellants,**

v.

**CHEVRON PHILLIPS CHEMICAL COMPANY, LP, Appellee.**

No. 01–09–00504–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 17, 2009.

David J. Beck, David M. Gunn, Joe W. Redden Jr., Matthew P. Whitley, Beck, Redden & Secrest, L.L.P., Houston, TX, S.R. Lewis Jr., Lewis & Williams L.L.P., Galveston, TX, for Appellants.

Alton C. Todd, The Law Firm of Alton C. Todd, Friendswood, TX, Natalie L. Arbaugh, Fish & Richardson P.C., Thomas M. Melsheimer, Dallas, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and SHARP.

## OPINION

LAURA CARTER HIGLEY, Justice.

INEOS[1] appeals the trial court's issuance of a temporary injunction prohibiting it from soliciting, negotiating, or entering into technology licensing agreements for a particular grade of polyethylene plastic

---

1. INEOS Group Ltd., INEOS Technologies, INEOS Americas LLC, INEOS Manufacturing Belgium NV, INEOS LLC INEOS Europe Limited, INEOS Polyethylene North America, INEOS USA LLC, and INEOS Olefins, LP are defendants in the trial court and appellants on appeal. We refer to the companies collectively as INEOS.

made by using a certain manufacturing process. The temporary injunction is based on Chevron Phillips Chemical Company's ("CPChem") claim that the technology underlying this manufacturing process is derived from its trade secrets. In one issue, INEOS argues that the technology is no longer entitled to trade secret protection because, through a lack of vigilance, CPChem disclosed the technology to third parties, which are no longer required to keep the information confidential.

Because INEOS has not shown that the trial court abused its discretion by issuing the temporary injunction, we affirm.

### Factual & Procedural Background

Beginning in the early 1950s, Phillips Petroleum Company, a corporate predecessor of CPChem, developed technology important to the manufacturing of polyethylene plastic. Phillips discovered that a chrome catalyst could be used to make high density polyethylene, a tough, durable plastic. In 1958, a Phillips engineer invented the loop slurry process for manufacturing high density polyethylene. This process had a number of advantages. It permitted high density polyethylene to be made more cheaply, more efficiently, more reliably, and in greater quantities than the previous process allowed.

In 2000, Chevron Chemical merged with Phillips to create CPChem. At that time, CPChem acquired the ownership rights to the loop slurry process. Since the 1950s, Phillips and CPChem have invested significant time and money to further develop the loop slurry technology.

Phillips provided the loop slurry technology to other chemical companies through licensing agreements. This enabled the licensee company to construct its own loop slurry plant to manufacture high density polyethylene. Under a licensing agreement, the licensee received a license package, which included the technical information necessary to construct a loop slurry plant. In the package, Phillips provided not only its most recent loop slurry technology to the licensee, but also provided its historical technical information reaching back to the 1950s. After a licensee had constructed its loop slurry plant, Phillips continued to share updated technical information with the licensee as the information was developed. Since 1958, Phillips and CPChem have entered into over 100 licensing agreements for the loop slurry technology. CPChem succeeded to the license interests of Phillips after the merger between Phillips Chemical and Chevron Chemical.

In the mid–1950s, Phillips entered into licensing agreements with Distillers Company Limited, Celanese Corporation, and an Italian company, Solvay. Under these agreements, Phillips provided technical information for the construction of polyethylene manufacturing plants. Each agreement contained a perpetual confidentiality provision, requiring the licensee to keep the technical information provided by Phillips confidential into perpetuity.

Phillips continued to share its technical information, including its loop slurry technology, with the licensees until 1974. Years later, the manufacturing plants constructed under the three licenses became part of a joint venture between Solvay and BP International Limited. In 2004, BP purchased Solvay's interest in the joint venture. BP then formed a separate company, Innovene, to hold the assets of the joint venture, including the plants constructed pursuant to the three licenses. The next year INEOS purchased Innovene. As a result, INEOS succeeded to the interests of the original licensees.

When it purchased Innovene, INEOS also acquired Innovene's loop slurry pro-

cess. INEOS soon began licensing the Innovene loop slurry technology to third parties. Pursuant to three separate licensing agreements, INEOS provided the Innovene loop slurry technology to three Chinese companies for the construction of polyethylene plants.

After learning of the licensing agreements, CPChem filed suit against INEOS for misappropriation of trade secrets and breach of contract. CPChem alleged that the loop slurry technology licensed by INEOS contained the loop slurry technology provided by Phillips to INEOS's predecessors under the 1950s licenses. CPChem alleged that the loop slurry technology disclosed by INEOS to its licensees was CPChem's trade secrets and confidential information. CPChem further claimed that INEOS's licensing of the technology violated the perpetual confidentiality provisions of the three 1950s licensing agreements between Phillips and INEOS's predecessors. CPChem sought permanent injunctive relief and damages.

After CPChem filed suit, INEOS continued to license the Innovene loop slurry technology to other companies. CPChem requested the trial court to grant a temporary injunction prohibiting INEOS from disclosing the Innovene loop slurry technology to any third party, including INEOS's licensees, pending trial.

The trial court conducted an eight-day evidentiary hearing on CPChem's application for temporary injunction. Among its grounds for opposition to the temporary injunction, INEOS argued that, over the years, CPChem failed to diligently maintain the secrecy of its loop slurry technology. INEOS cited agreements under which Phillips had disclosed its loop slurry technology without requiring the licensee to maintain the confidentiality of the technol-

ogy into perpetuity. INEOS specifically relied on agreements signed by Phillips containing secrecy clauses that had expired years earlier.

CPChem responded that no evidence exists to show that the expiration of the confidentiality provisions resulted in the public disclosure of its loop slurry technology. CPChem offered evidence showing that the potential threat of disclosure of its trade secrets following the expiration of the confidentiality provisions had been ameliorated or neutralized with respect to each of the agreements cited by INEOS.

At the hearing's conclusion, the trial court granted CPChem's request for a temporary injunction. The trial court did not file findings of fact or conclusions of law, but determined in its order that CPChem "has established (a) viable causes of action against INEOS, (b) a probable right to the relief sought on those causes of action, and (c) a probable, imminent, and irreparable injury in the interim for which CPChem has no adequate remedy at law."

In the order, the trial court narrowly tailored the injunctive relief granted to CPChem. Specifically, the trial court ordered that INEOS is

temporarily enjoined from soliciting, negotiating, or entering into licenses for monomodal high density polyethylene grade of 5502 having a melt index in the range of 0.3 to 0.4 and a density of 954–957 kilograms per cubic meter by whatever name made using a chrome catalyst in a loop slurry process.

INEOS appeals, challenging the temporary injunction in one issue.[2]

---

**2.** A party may appeal from an interlocutory order of a district court that grants or denies a temporary injunction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(4) (Vernon 2008).

### Temporary Injunctions: Standard and Scope of Review

The sole issue presented to a trial court at a temporary injunction hearing is whether the applicant may preserve the status quo pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002); *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204.

On appeal, the scope of review is limited to the validity of the temporary injunction order. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). We do not review the merits of the underlying case. *Davis*, 571 S.W.2d at 861. Instead, we determine whether there has been an abuse of discretion by the trial court in granting or denying the relief. *Id.* at 862. In making this determination, we may not substitute our judgment for that of the trial court unless its decision was so arbitrary that it exceeded the bounds of reasonableness. *See Butnaru*, 84 S.W.3d at 204. Abuse of discretion does not exist if the trial court heard conflicting evidence, and evidence appears in the record that reasonably supports the trial court's decision. *Davis*, 571 S.W.2d at 862; *CRC–Evans Pipeline, Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ). A trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts. *See State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975). Given the abuse-of-discretion-standard, we review the evidence submitted to the trial court in the light most favorable to the court's ruling, draw all legitimate inferences from the evidence, and defer to the trial court's resolution of conflicting evidence. *See Davis*, 571 S.W.2d at 862; *CRC–Evans Pipeline, Int'l*, 927 S.W.2d at 262.

### Probable Right of Relief

A temporary injunction is an extraordinary remedy that does not issue unless the party seeking relief pleads and proves three specific elements: (1) a cause of action, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. To show a probable right of recovery, an applicant need not establish that it will finally prevail in the litigation, but it must, at the very least, present some evidence that, under the applicable rules of law, tends to support its cause of action. *Camp v. Shannon*, 162 Tex. 515, 348 S.W.2d 517, 519 (1961); *see IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 197 (Tex.App.-Fort Worth 2005, no pet.).

In its sole issue, INEOS asserts that CPChem failed to demonstrate a probable right of relief on its misappropriation of trade secrets claim. More precisely, INEOS argues that CPChem failed to demonstrate that its loop slurry technology constitutes a trade secret.

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex.2003). To determine whether a trade secret exists, a court weighs six fact-intensive factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in

developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See id.* (citing RESTATEMENT OF TORTS § 757 cmt. b. (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's note cmt. d. (1995)). INEOS asserts that the first and third factors—the extent to which the information is known outside of the business and the extent of measures taken to guard the secrecy of the information—are of predominant consideration in this case.

INEOS acknowledges that CPChem's loop slurry technology was at one time a trade secret.[3] Nevertheless, INEOS asserts that the information lost trade secret status due to CPChem's lack of vigilance with respect to guarding the secrecy of the information.

To support its argument, INEOS offered a number of agreements between Phillips and third-party companies. Several of these agreements contained fixed-term secrecy provisions, which required the other party to maintain the confidentiality of Phillips's disclosed trade secrets for a set number of years.

At the time of the hearing, the period defined in each of these fixed-term secrecy clauses had expired. INEOS argued that, following the expiration of the secrecy provisions, the third parties, with whom Phillips had contracted, possessed CPChem's trade-secret information without restriction and were free to publicly disclose it. INEOS asserted that the expiration of these clauses destroyed the trade secret status of CPChem's technology.

CPChem responded that it had always been vigilant in maintaining the secrecy of its loop slurry technology. With respect to the agreements cited by INEOS,

CPChem offered countervailing evidence to show that, under the unique circumstances of each, the secrecy of its technology remained intact, despite the expiration of the secrecy clauses.

We now turn to the record evidence regarding this issue.

At the temporary injunction hearing, INEOS introduced a number of agreements between Phillips and Japanese companies, Showa Denko and Showa Yuka. In 1956 and 1973, Phillips entered into licensing agreements with Showa Denko. Also in 1973, Phillips signed another licensing agreement with Showa Yuka; that agreement was later assigned to Showa Denko. All three licenses contained perpetual secrecy clauses.

In 1979, Showa Denko planned to sell one of its plants to another company, Tonen. Phillips agreed that Showa Denko could sublicense the technology it had obtained from Phillips under the earlier licenses. Phillips and Showa Denko signed an agreement in December 1979 permitting Showa Denko to sublicense Phillips's technology to Tonen.

The agreement included the following provision addressing the issue of secrecy: "[Showa Denko] agrees to bind Tonen to secrecy with an agreement having a term of fifteen (15) years from the date of sale of the Kawasaki plant." The December 1979 agreement also required Showa Denko to pay Phillips $1.5 million for the right to grant the sublicense to Tonen.

■■■ INEOS asserts that Showa Denko paid $1.5 million to Phillips specifically for the shortened secrecy term. INEOS cites the testimony of one of CPChem's witnesses, Randy Lee Hagenson, CPChem's Manager of Polyethylene Licensing, which

---

3. At the hearing, CPChem cited seven examples of its trade secrets relating to its loop slurry process that INEOS is disclosing in its licensing packages.

supports this interpretation of the December 1979 agreement.[4] INEOS relies on this interpretation of the agreement to support its argument that Phillips did not protect the secrecy of its technology. INEOS intimates that accepting the $1.5 million dollars in exchange for the shortened term is significant evidence because it shows an affirmative act with respect to the loss of secrecy, rather than a mere failure to act to protect it. However, such interpretation of the agreement between Phillips and Showa Denko is not supported by the express terms of the written agreement.

The December 1979 agreement between Showa Denko and Phillips did not specifically provide that Showa Denko was required to pay Phillips $1.5 million in exchange for a shortened secrecy requirement. Although the shortened secrecy requirement may have influenced the sum paid, the plain language of the agreement indicates that Showa Denko paid $1.5 million to Phillips in exchange for the right to grant a sublicense to Tonen. No mention is made in the agreement that the funds were paid specifically for the shortened secrecy requirement.

At the injunction hearing, CPChem proffered the testimony of Randy Lee Hagenson, who testified that he is responsible for licensing the loop slurry process. He described his job responsibilities as "respond[ing] to licensing opportunities around the world," "writ[ing] licenses for new opportunities," and "support[ing] existing licenses through various programs we have."

CPChem offered Hagenson's testimony to show that any trade-secret information that may have been transferred to Tonen had remained confidential, despite the expiration of the Tonen secrecy clause in 1994. Hagenson testified that Tonen, Showa Denko, and Showa Yuka are now all owned by Japan Polyethylene, which is bound by the perpetual confidentiality provision in the 1956 Showa Denko licensing agreement. Although it is undisputed that Tonen was acquired by Japan Polyethylene at some point after the secrecy clause expired in 1994, CPChem's evidence showed that it was unaware that any of its trade secrets had been publically disclosed as a result of the expiration of any fixed-term secrecy clause. This would necessarily include the Tonen agreement.

In his testimony, Hagenson also provided an example of how CPChem had acted to guard its technical information in the hands of the Japanese companies. Hagenson testified that, when it learned that Showa Denko had sought to license the loop slurry technology to a another third-party, CPChem contacted Showa Denko to object. Showa Denko then assured CPChem that it would not attempt to license the technology in the future.

INEOS also offered agreements pertaining to the construction of a polyethylene plant in Basrah, Iraq. The first is a licensing agreement between Phillips and the Iraqi government's Ministry of Industry and Minerals ("the Ministry"), signed in 1976. This agreement had a 25–year secrecy clause.

With regard to the agreement, Hagenson testified that, the force majeure provision had been triggered due to war and civil unrest in Iraq, putting the agreement in "abeyance." Hagenson indicated that,

---

**4.** We are reminded that, when the meaning of a contract is plain and unambiguous, a witness's interpretation of the contract is immaterial. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981); *Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 286 (Tex.App.-Houston [1st Dist.] 1995, no writ) (explaining that in absence of finding of ambiguity, affidavit stating meaning of contractual language is "irrelevant").

because of the force majeure, it was CPChem's position that the "clock never started ticking" on the agreement; thus, the 25–year time period for the secrecy clause never began to run.

Hagenson also testified that, before the Iraqi polyethylene plant was built, Phillips and the Ministry entered into a new licensing agreement in 1988.[5] This agreement contained a perpetual secrecy provision.

INEOS also introduced another agreement from 1976 relating to the construction of the Basrah plant. The Ministry had chosen contractors Lummus and Thyssen to construct the plant. To facilitate construction, Phillips signed an agreement with Lummus and Thyssen to govern the disclosure of Phillips's technology to the contractors. The agreement had a 25–year secrecy provision.

With respect to the contractors, Hagenson testified that, by 1988, when the second agreement was signed containing the perpetual secrecy provision, Thyssen was no longer a contractor on the Basrah project, only Lummus remained. Hagenson testified that, by 1988, Thyssen "was out of the business" of contracting.

With respect to Lummus. Hagenson testified that CPChem has had many business dealings with the company since the Basrah project. In these dealings, Lummus has signed perpetual secrecy agreements with regard to the CPChem's loop slurry technology. Hagenson testified that Lummus has never built a loop slurry plant without CPChem's permission. And Hagenson has "never heard Lummus claim they got anything from [the] Iraq project," with respect to CPChem's technology.

INEOS also points to another document relating to the construction of the Basrah plant. INEOS introduced a form entitled "Secrecy Agreement," which Phillips had forwarded to Lummus in 1978. Under the Secrecy Agreement, a subcontractor was required to keep Phillips's confidential information secret for 25 years. Phillips requested that Lummus's subcontractors sign the agreement before receiving Phillips's confidential information on the Basrah project. However, INEOS did not introduce any agreements actually signed by a subcontractor or offer any evidence regarding which, if any, subcontractors had received Phillips's trade secrets.

Lastly, INEOS offered another licensing agreement that had a limited term confidentiality provision. In 1976, Phillips signed a licensing agreement with the Norwegian company, Norpolefin. The agreement had a 25–year secrecy clause, which expired in 2001.

CPChem introduced evidence to show that it had taken corrective action to prevent disclosure of its technology under the Norpolefin agreement. In 2003, CPChem renegotiated the agreement with Norpolefin's successor, Borealis. Under the new agreement, the secrecy provision was extended by 50 years. The parties also agreed that the new secrecy provision would be retroactive. In addition, Borealis warranted that it had not disclosed any of CPChem's confidential information.

On appeal, INEOS's briefing focuses on the expired secrecy clauses. As it did at the hearing, INEOS posits that once the secrecy provisions in the various agreements expired, CPChem's loop slurry technology lost trade secret status. INEOS asserts that the expired confidentiality

---

5. INEOS points out that at the hearing it objected to Hagenson's testimony regarding the 1988 agreement based on the best evidence rule. However, the record shows that Hagenson had testified regarding the 1988 agreement and its perpetual confidentiality provision earlier in the hearing without objection.

provisions demonstrate a lack of vigilance by CPChem to guard the secrecy of its information. INEOS contends that such lack of vigilance is fatal to preserving a trade secret right. INEOS argues that, as a result, CPChem has not demonstrated a probable right of relief necessary to support a temporary injunction.

In its brief, INEOS accurately recites the legal principles on which it bases its position. We summarize these principles as follows:

- **A trade secret must be a secret.** *See Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex.1964) ("It is self-evident that the subject matter of a trade secret must be kept secret."); *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 634 (Tex.App.-Fort Worth 2007, pet. denied) ("Before information can be termed a trade secret, there must be a substantial element of secrecy."); *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex.App.-Corpus Christi 1990, no writ) ("[T]he key part of the definition of trade secret is secrecy.").

- **Vigilance in guarding the trade secret is required because, once the information is publically revealed through the owner's lack of vigilance, it is no longer a trade secret; the element of secrecy is gone.** *See Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex.1996) ("Vigilance in the area of trade secrets is required, particularly because once a trade secret is made public all ownership is lost."); · *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd) ("Courts have refused to give trade secret protection when the material or procedure sought to be protected has been publicly disclosed."); *see also Interox America v.*

*PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984) (concluding that one who voluntarily discloses information or fails to take reasonable precautions to insure its secrecy cannot claim that information constituted trade secret).

- **A trade secret owner may disclose trade secret information to a third party without risk of losing trade secret protection if the owner takes steps to insure the secrecy of the information.** *See Furr's Inc. v. United Specialty Advertising Co.*, 385 S.W.2d 456, 459 (Tex.Civ.App.-El Paso 1964, writ ref'd n.r.e.) ("The owner of the secret must do something to protect himself. He will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty.").

- **Courts have held that the unrestricted disclosure of trade-secret information to third parties, outside the context of a confidential relationship, destroys the trade-secret status of the information.** *See, e.g., Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex.App.-Fort Worth 1987, no writ) (concluding that data not trade secret because owner had previously disclosed it in contracts to its customers); *Interox America*, 736 F.2d at 202 (considering owner's past conduct of voluntarily giving third-party contractors manuals containing technical information to support conclusion that information not entitled to trade secret protection).

Although urged by INEOS, we may not apply these legal principles in this interlocutory appeal to determine whether CPChem's loop slurry technology is a trade secret.[6] *See Davis*, 571 S.W.2d at

6. INEOS asserts that the trial court abused its discretion in granting the temporary injunc-

tion because it misapplied the law to the established facts. *See State v. Sw. Bell Tel.*

861; *see also Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 423–24 (Tex.App.-Houston [14th Dist.] 2007, no pet.). We also do not assume that the trial court made this determination. To the contrary, when deciding whether to grant trade-secret protection through a temporary injunction, a trial court does not determine whether the information sought to be protected is, in law and fact, a trade secret; rather, the trial court determines whether the applicant has established that the information is entitled to trade secret protection pending the trial on the merits. *See Sharma,* 231 S.W.3d at 424; *IAC, Ltd.,* 160 S.W.3d at 197.

■■ On appeal, the dispute is whether CPChem showed a probable right to the relief sought on its misappropriation of trade secrets claim, a necessary showing for it to obtain a temporary injunction. To show a probable right of recovery, as it relates to the trade secret element of its claim, CPChem was required to present some evidence in the trial court tending to show that it possessed a trade secret. *See Camp,* 348 S.W.2d at 519. The more specific dispute on appeal, as defined by INEOS's briefing, is whether CPChem presented some evidence tending to show that it was sufficiently vigilant in guarding the secrecy of its loop slurry technology. *See id.* By issuing the temporary injunction, the trial court implicitly determined that CPChem made this showing. We must determine whether the trial court abused its discretion in reaching this conclusion.

At the center of the vigilance dispute are the expired secrecy clauses relied on by INEOS. CPChem presented evidence

from which a reasonable inference could have been drawn that CPChem took steps to preserve the secrecy of its technology. CPChem presented evidence that it secured perpetual secrecy agreements from Lummus and obtained a 50–year secrecy agreement with Borealis. CPChem also warned Showa Denko not to disclose the loop slurry technology when Showa Denko appeared to be contemplating licensing the technology to a third party.

In addition, CPChem presented evidence indicating that it was justified in taking no action with respect to some of the expired secrecy provisions. In this regard, the evidence showed that any threat of disclosure or unauthorized use of CPChem's trade secrets had already been neutralized by other circumstances.

CPChem's evidence showed that it believed the 1976 agreement with the Ministry of Iraq, containing the 25–year secrecy clause, was held in abeyance due to force majeure. For this reason, CPChem introduced testimony indicating that the company believed that the time period on the secrecy provision was never triggered. CPChem also showed that it signed a new agreement with the Ministry in 1988 containing a perpetual secrecy provision.

CPChem also offered evidence demonstrating that it had reason to believe that any threat posed by the proposed 15–year secrecy clause in the proposed Tonen sub-license had been neutralized. Tonen is owned by Japanese Polyethylene, which owes a perpetual secrecy obligation to CPChem.

Co., 526 S.W.2d 526, 528 (Tex.1975). INEOS argues that CPChem lost its trade secret as a matter of law. INEOS asserts that the underlying facts are established because it is undisputed that the cited secrecy clauses have expired. INEOS is only partly correct. While some of the facts may be characterized as

established, many of the facts relevant to determining the questions of vigilance and secrecy are not. This is demonstrated by CPChem's countervailing evidence offered with regard to the expired secrecy clauses, as discussed herein.

With regard to the remaining agreements cited by INEOS, no evidence was presented to show that CPChem's trade secrets had been disclosed to the contracting party. Specifically, no evidence showed that Thyssen came into possession of CPChem's technology while the original Iraqi agreement was in abeyance, and before Thyssen went out of the contracting business. No evidence was presented to show which, if any, subcontractors on the Basrah project received CPChem's trade secrets or which, if any, signed the fixed-term secrecy form introduced by INEOS.

In addition, CPChem introduced testimony that it is unaware that any of the expired secrecy obligations cited by INEOS has resulted in the unauthorized public disclosure of its trade secrets. INEOS presented no evidence to the contrary. It is also undisputed that the vast majority of the licenses given by Phillips and CPChem over the past 50 years contain perpetual secrecy clauses. It is also noteworthy that CPChem introduced evidence detailing the strict security measures it has implemented and maintained over the years to keep its loop slurry technology confidential, aside from the secrecy agreements.

██ When an effort is made to keep material important to a particular business from competitors, trade secret protection is warranted.[7] *See Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex. App.-Dallas 1993, no writ); *Gonzales v. Zamora,* 791 S.W.2d 258, 265 (Tex.App.-Corpus Christi 1990, no writ). After viewing the evidence submitted to the trial court in the light most favorable to the court's ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence, we conclude that CPChem presented some evidence tending to show that it acted with vigilance to maintain the secrecy of its trade secrets.[8] The trial court

---

7. At oral argument, INEOS relied heavily on *Purnell v. Thyssen Industrie AG Henschel* for the proposition that CPChem's trade secrets were destroyed when the secrecy clauses expired. No. 01–95–00125–CV, 1995 WL 622919, *5 (Tex.App.-Houston [1st Dist.] 1995, no writ) (not designated for publication). In *Purnell,* the trial court had granted a temporary injunction to protect the plaintiff's trade secrets pending trial. *Id.* at *2–3. This Court reversed the trial court's order because the evidence showed that the plaintiff had failed to maintain the secrecy of its trade secrets by disclosing the information freely and without restriction to one of the defendants over the course of many years. *Id.* at *5. The plaintiff also never told the defendant that the information was confidential until it asked the defendant to sign a confidentiality agreement. *Id.* After the defendant refused to sign the confidentiality agreement, the plaintiff continued to give the defendant the information without any restrictions. *Id.* Such facts are absent in this case. Similarly, the pivotal facts argued by INEOS as destroying the secrecy of CPChem's trade secrets are absent in *Purnell.* The defendants in *Purnell* did not rely on an

expired secrecy clause in a contract with a non-party to demonstrate a lack of trade secret. Moreover, the plaintiff in *Purnell* introduced minimal, if any, evidence to show any measures it had taken to maintain the secrecy of its information. The factual differences between *Purnell* and this case compel us to conclude that *Purnell* is not controlling in this fact-intensive case.

8. In its brief, INEOS asserts, "Other jurisdictions agree that the expiration of such secrecy provisions kills the secret." INEOS cites two federal cases from Massachusetts, *DB Riley, Inc. v. AB Engineering Corp.,* 977 F.Supp. 84, 91 (D.Mass.1997) and *Baystate Technologies, Inc. v. Bentley Systems, Inc.,* 946 F.Supp. 1079, 1093 (D.Mass.1996), and one state court opinion from Wisconsin, *ECT International, Inc. v. Zwerlein,* 228 Wis.2d 343, 597 N.W.2d 479, 484–85 (1999). These cases are inapposite to instant one. In *Zwerlein,* the defendant, who sought to utilize the trade secret information, was the same party who had the limited-term secrecy agreement with the trade secret owner. 597 N.W.2d at 484–85. The defendant was not relying on an expired secrecy clause in a third-party agree-

reasonably determined that (1) CPChem demonstrated a probable right to the relief sought and (2) CPChem's loop slurry technology is entitled to trade secret protection pending trial on the merits. We hold that the trial court properly exercised its discretion in granting the temporary injunction.[9]

We overrule INEOS's sole issue.

### Conclusion

We affirm the trial court's order granting the temporary injunction.

ment, as INEOS does here. *See id.* In both *DB Riley* and *Baystate Technologies*, other significant evidence was introduced, besides the expired secrecy agreements, to show that the trade secret owner had been less than vigilant in maintaining the secrecy of its information. *See DB Riley*, 977 F.Supp. at 91; *Baystate Tech.*, 946 F.Supp. at 1092–93. Here, INEOS relies entirely on the expired secrecy agreements with third-parties to show that CPChem lacked vigilance in maintaining its trade secrets. Moreover, the type of countervailing evidence offered by CPChem in this interlocutory matter appears to have been lacking in the cited cases.

9. By our decision today in this interlocutory appeal, we do not decide, nor do we imply, that CPChem will ultimately prevail on its claims.