**Opinion issued October 13, 2016**



In The

# Court of Appeals

For The

# First District of Texas

---

## NO. 01-16-00133-CV

---

## OLIVE JEAN LAWRENCE, Appellant

## V.

## CHERYL PAGE, Appellee

---

**On Appeal from the Probate Court No. 1**
**Harris County, Texas**
**Trial Court Case No. 445,145**

---

## MEMORANDUM OPINION

Appellant, Olive Jean Lawrence ("Jean"), is the proposed ward in a guardianship proceeding initiated by her adult daughter, appellee, Cheryl Page. In this accelerated interlocutory appeal, Jean challenges the trial court's denial of her

special appearance and issuance of a temporary injunction against her and her other adult daughter, Lisa Rabren. We affirm.

**Factual and Procedural Background**

Jean is an elderly widow who lived in the same house in Houston, Texas for over 50 years. Cheryl and Lisa are Jean's adult daughters. Cheryl seeks to be appointed permanent guardian of Jean's person and estate because of Jean's declining health and because of perceived financial exploitation of Jean by Lisa. Jean is currently in Georgia with Lisa; she flew there the day before Cheryl filed her guardianship application. Cheryl claims that Lisa fled with Jean to avoid the guardianship proceeding in Texas and continues to spend Jean's funds on herself and her family.

### *Jean's mental and physical health begin to decline*

Jean is an 89-year-old widow with four adult children: Cheryl Page, Derrill Lawrence, James Lawrence, and Lisa Rabren. Over the past several years, and especially since 2015, Jean's physical and mental health have been in decline. None of Jean's children believe Jean is capable of living by herself.

Jean has congestive heart failure and has undergone several heart surgeries. She uses a walker and cannot bathe herself, drive, or administer her own medications. Jean suffers from short-term and long-term memory decline and has "difficulty" with "complex" tasks. According to Cheryl, Jean has "lost a handle on

2

her finances . . . ." Jean is unable to balance her own checkbook and is unaware of how much stock she currently owns.

### *Lisa and her family move in with Jean, and Cheryl grows concerned*

In January 2014, Lisa and her family moved into Jean's home at 13030 Pebblebrook Drive in Houston, Texas. Jean had lived at this address since 1965, and had designated it as her homestead as recently as 2009.

The Rabrens moved in with Jean, in part, because Jean could no longer live by herself due to her declining health, and, in part, because the Rabrens were in need of financial assistance. Over the years, Jean had provided the Rabrens a significant amount of financial aid, and she continued to do so after they moved in with her. Since 2008, for example, Jean has written personal checks to Lisa totaling over $450,000.00.

Cheryl eventually began to worry that Lisa was exerting undue influence and control over Jean, and financially exploiting Jean, but not providing Jean adequate care and attention. Cheryl claims that "[i]t is difficult for family members to visit with [Jean] because they feel like they have to go through Lisa Rabren first to get any access." According to Cheryl, the funds Jean has provided Lisa "have significantly reduced the amount of [Jean]'s resources available to provide for her continued care."

3

Cheryl and her brothers, Derrill and James, are worried that if Jean continues giving money to Lisa, Jean will not have enough money to meet her own needs. In November 2015, Cheryl, Derrill, and James met with Jean and convinced her to undergo a medical evaluation by a physician with "expertise" in "elderly people with declining memory issues." But, several days later, after Jean had returned home to Lisa, Jean told Cheryl that she had changed her mind about the evaluation.

### *Jean plans to stay in Texas for Christmas, then decides to go to Georgia with Lisa instead*

On November 30, 2015, Lisa sent Cheryl a text message explaining that she and her family would be in Georgia from December 21, 2015, through January 4, 2016, and that someone would have to take care of Jean while they were gone. Cheryl made plans to stay with Jean during this time.

On December 18, 2015, Lisa sent Cheryl a follow-up text message asking whether Cheryl had arranged for someone to take care of Jean while the Rabrens were in Georgia. Cheryl replied that she would be taking care of Jean.

On December 19, 2015, Jean called Cheryl and told her that, instead of staying in Houston for Christmas, she would be traveling to Georgia with the Rabrens. Jean told Cheryl that her plane tickets had already been purchased, and that she would return to Houston on January 2, 2016. The next morning, Cheryl sent Lisa an e-mail stating her concerns regarding the trip and asking Lisa to reconsider taking Jean to Georgia. Lisa responded later that day, confirming that

4

Jean was travelling with them and was scheduled to return to Houston on January 2, but assured Cheryl that she would arrange for Jean to return earlier if there was "any indication" that Jean was "not handling the trip well . . . ."

### Cheryl initiates this guardianship proceeding

On December 21, 2015, Cheryl filed a verified guardianship application, requesting that the trial court appoint her as permanent guardian of Jean's person and estate. In the application, Cheryl alleged that:

> Based on [Jean]'s current physical and mental condition, she can no longer provide proper care and attention to her personal and financial needs. [Jean] is easily susceptible to financial abuse and has been under pressure to provide for the Rabren family. The chronic drain on [Jean]'s financial resources has compromised her retirement funds to the point where if this continues she will not have enough resources to take care of herself.

### Cheryl discovers that Lisa has moved to Georgia with Jean

On Monday, January 4, 2016, Cheryl drove from her residence in Bryan-College Station to Houston to visit Jean at her home. Jean was supposed to have just returned from her trip to Georgia. Cheryl had confirmed with both Jean and Lisa that Jean's return flight was on January 2.[1] But, when Cheryl arrived at Jean's house, she discovered that the house had been "cleaned out" and Jean was not

---

[1] As noted above, on Sunday, December 20, 2015, Lisa sent Cheryl an e-mail confirming that Jean was scheduled to return to Houston on January 2, 2016. And on January 1, 2016, Cheryl spoke with Jean by phone, and Jean confirmed she was still scheduled to fly back to Houston the following day.

5

there. Cheryl also discovered notes left by Lisa indicating that the Rabrens and Jean would not be returning from Georgia. Cheryl called the police and filed a missing person report.

On January 5, 2016, Cheryl received a call from a Georgia police officer. The officer informed Cheryl that he had performed a "welfare check" on Jean, and that Jean "appeared to be fine." The officer also informed Cheryl that he had spoken with Lisa, and that Lisa had explained "that there ha[d] been some family problems and that her lawyer would be contacting [Cheryl's] lawyer."[2] The same day as the welfare check, approximately one-half of Jean's stock—worth a little over $60,000.00—was cashed in and the proceeds were deposited into Jean's checking account.

### The trial court grants Cheryl's temporary restraining order and denies Jean's special appearance

On January 7, 2016, after discovering that Jean had stayed in Georgia with the Rabrens and sold half of her remaining stock, Cheryl filed a verified petition for injunctive relief. Cheryl requested that the trial court issue an ex-parte TRO and, ultimately, a temporary injunction, restricting Jean's and Lisa's access to Jean's money and other assets. Later that day, the trial court signed and entered a

---

[2] Cheryl later testified that neither she nor her lawyer ever received a call from a lawyer representing Lisa.

TRO, set Cheryl's temporary injunction application for hearing, and appointed Jean an attorney ad litem.

On January 20, 2016, Jean's retained counsel filed a special appearance, which argued that the trial court lacked personal jurisdiction over Jean because Jean was no longer a resident of Texas when Cheryl filed her guardianship application on December 21, 2015. Later that day, the trial court held a hearing on Cheryl's temporary injunction application and a motion for continuance filed by Jean's attorney ad litem. Jean's retained counsel appeared at the hearing, subject to Jean's special appearance, and objected to the trial court's jurisdiction to consider the pending motions. The trial court denied Jean's special appearance without hearing arguments or evidence from either side. At the end of the hearing, the trial court signed and entered a second TRO, which extended the original TRO, ordered an accounting of Jean's assets, and reset the hearing on Cheryl's temporary injunction application to February 3, 2016.

***The trial court issues a temporary injunction against Jean and Lisa***

At the February 3 hearing, Cheryl offered evidence in support of her temporary injunction application. Cheryl testified about Jean's declining health, the financial assistance Jean had been providing to Lisa and the Rabrens, and Jean's recent move to Georgia. She testified that she had reviewed the court-ordered accounting of Jean's assets, and that it had listed several checks made

payable to Lisa, one of which was written for "earnest money" for a home in Georgia. Cheryl said she fears that Jean's "remaining assets are in imminent danger" because Lisa may be attempting to purchase a home in Georgia with Jean's assets.

Among other exhibits, Cheryl offered checks from Jean to Lisa, some of which were written in Lisa's handwriting, as well as a voice recording in which Lisa impersonated Jean on a phone call with a stock transfer company to sell over $14,000.00 of Jean's stock.

Cheryl also offered the report of court investigator, Anthi Pavlicek.[3] In the report, Pavlicek summarized the findings of her investigation of the allegations in Cheryl's guardianship application. Among other things, Pavlicek stated that, since May 2014, over $145,000.00 worth of Jean's stock had been sold, and of that amount, nearly $90,000.00 had been sold since October 2015.

Pavlicek also summarized a telephone conversation she had with Jean on February 2, 2016, the day before the hearing. According to Pavlicek, during the conversation, it was unclear whether Jean was answering Pavlicek's questions herself or receiving assistance from someone.

---

[3] *See* TEX. EST. CODE ANN. § 1054.151 (West 2014) ("On the filing of an application for guardianship under Section 1101.001, a court investigator shall investigate the circumstances alleged in the application to determine whether a less restrictive alternative to guardianship is appropriate.").

Jean told Pavlicek that she did not know the balances of her bank accounts or how much stock she owned, and that she was unaware that over $30,000.00 in checks had been written to Lisa over the past year. Pavlicek stated that Jean's "tone changed and she sounded surprised" when Pavlicek informed her of the amount of checks that had been written to Lisa over the past year.

Although Jean's bank records included checks for "earnest money" on residential property, Jean told Pavlicek that she was not in the process of buying a new house. And although Jean had recently executed powers of attorney naming Lisa as agent, Jean told Pavlicek that she had not signed any such document. Pavlicek recommended that the trial court appoint Jean a guardian ad litem.

After the hearing, the trial court signed and entered a temporary injunction restricting Jean's and Lisa's access to Jean's funds and other assets. The next day, on February 4, 2016, the trial court signed and entered orders (1) appointing Jean a temporary guardian pending contest, (2) denying Jean's special appearance,[4] and (3) requiring a medical examination of Jean to take place on or before March 18, 2016.

Jean then filed this appeal.

---

[4] The trial court did not sign and enter an order denying Jean's special appearance at the earlier hearing on January 20, 2016.

**Analysis**

## A. Special Appearance

### 1. Standard of Review

Because the existence of personal jurisdiction is a question of law, we review a trial court's order granting or denying a special appearance de novo. *Searcy v. Parex Res., Inc.*, 14-0293, 2016 WL 3418248, at \*4 (Tex. June 17, 2016); *Trenz v. Peter Paul Petroleum Co.*, 388 S.W.3d 796, 800 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

The plaintiff bears the initial burden of pleading sufficient allegations to invoke jurisdiction under the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). Once the plaintiff meets this burden, the burden shifts to the defendant to negate all bases of jurisdiction in those allegations. *Id.*

When, as here, the trial court does not issue findings of fact or conclusions of law, we imply all facts necessary to support the ruling so long as the evidence supports them. *Henkel v. Emjo Invs., Ltd.*, 480 S.W.3d 1, 5 (Tex. App.—Houston [1st Dist.] 2015, no pet.). And we will affirm the trial court's ruling on any legal theory that finds support in the record. *Id.*

## 2.    Personal Jurisdiction

In her first issue, Jean argues that the trial court's denial of her special appearance was erroneous because the evidence proved she is not a resident of Texas and therefore not amenable to process issued by Texas courts. Cheryl responds that the trial court's denial of Jean's special appearance was proper because Jean is a resident of Texas or otherwise subject to the general jurisdiction of Texas courts.

There are two types of personal jurisdiction: general and specific. *Searcy*, 2016 WL 3418248, at *5; *Henkel*, 480 S.W.3d at 5. General jurisdiction exists when the defendant is domiciled in the forum state and therefore may be "'fairly regarded as at home'" in the forum state. *Henkel*, 480 S.W.3d at 5 (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014)). Specific jurisdiction exists when the plaintiff's claim arises out of or is related to the defendant's purposeful contacts in the forum state. *Searcy*, 2016 WL 3418248, at *5. Thus, a Texas court has general jurisdiction over a defendant who is domiciled in Texas, and has specific jurisdiction over a defendant whose purposeful contacts give rise to the plaintiff's claim.

Under Texas law, a "domicile" is (1) an actual residence that is (2) intended to be a permanent home. *Willig v. Diaz*, No. 01–15–00073–CV, 2016 WL 2955395, at *3 (Tex. App.—Houston [1st Dist.] May 19, 2016, no pet.) (mem. op.)

11

(citing *Snyder v. Pitts*, 241 S.W.2d 136, 139 (Tex. 1951)); *see also Domicile*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "domicile" as "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere."). A "residence," therefore, is a lesser-included element of a domicile. *Willig*, 2016 WL 2955395, at *3. An individual may have multiple residences, but only one domicile. *See id.*

The trial court had sufficient evidence before it to conclude that Jean is domiciled in Texas and therefore subject to the general jurisdiction of Texas courts. The evidence included the sworn allegations in and evidence attached to Cheryl's guardianship application, temporary guardianship application, and temporary injunction application; and the sworn statements in and evidence attached to Jean's special appearance affidavit. *See* TEX. R. CIV. P. 120a(3) (in ruling on special appearance, court shall consider pleadings, stipulations, affidavits and attachments, discovery, and oral testimony.). From this evidence, the following facts are undisputed:

- Jean resided in Harris County, Texas for over 50 years.

- Jean lived at 13030 Pebblebrook Drive from the summer of 1965 until at least December 20, 2015, the day before Cheryl filed her guardianship application.

- Jean still owns 13030 Pebblebrook Drive.

12

- 13030 Pebblebrook Drive is Jean's principal estate and currently designated as Jean's homestead.

- Before Cheryl filed suit, both Lisa and Jean told Cheryl that Jean would return to 13030 Pebblebrook Drive on January 2, 2016.

These undisputed facts show that Jean is domiciled in and may be "fairly regarded as at home" in Houston, Texas, even if she has resided in Georgia since Cheryl filed her guardianship application. Jean owns an actual residence in Houston, Texas. As of the date Cheryl filed this guardianship proceeding, Jean had only expressed an intent that her residence in Houston remain her permanent home. *See Willig*, 2016 WL 2955395, at *3 ("The elements of the legal concept of 'domicile' are: (1) an actual residence, and (2) the intent to make it the permanent home.").

Jean later stated, in the affidavit attached to her special appearance, that she had decided to relocate permanently to Georgia before flying there with the Rabrens in late December 2015. Because the trial court did not issue findings of fact and conclusions of law, we must presume that the trial court resolved this conflict between Jean's affidavit and the rest of the evidence in favor of a finding of jurisdiction. *See First Oil PLC v. ATP Oil & Gas Corp.*, 264 S.W.3d 767, 785 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Accordingly, we hold that

13

Jean is subject to the trial court's general jurisdiction, and therefore overrule Jean's first issue.

### 3.    Notice of Hearing

In her second issue, Jean argues that the trial court's denial of her special appearance was erroneous because the trial court did not provide her with "reasonable notice of a hearing" and therefore denied her due process. For two reasons, we disagree.

First, Jean never requested a hearing on her special appearance. "'Rule 120a requires that the specially appearing defendant timely request a hearing [and] specifically bring that request to the trial court's attention . . . .'" *Davis v. Sampson*, No. 01–10–00604–CV, 2011 WL 6306639, at \*3 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.) (mem. op.) (quoting *Milacron Inc. v. Performance Rail Tie, L.P.*, 262 S.W.3d 872, 875–76 (Tex. App.—Texarkana 2008, no pet.); *see also Hart v. State*, No. 03–02–00542–CV, 2003 WL 549273, at \*2 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op.) ("The specially appearing defendant must not only request a hearing but must specifically call that request to the trial court's attention."). The record does not show that Jean requested a hearing on her special appearance after she filed the plea. Nor does it show that Jean ever complained that the trial court failed to provide her with reasonable notice at any point during or after the January 20 hearing. Because Jean

14

never requested a hearing on her special appearance, she cannot now complain that the trial court erred by failing to provide her with reasonable notice of a hearing. *See* TEX. R. APP. P. 33.1

Second, Jean has failed to show any harm from the trial court's failure to provide her with reasonable notice of a hearing on her special appearance. *See* TEX. R. APP. P. 44.1 (order is not reversible unless error probably caused improper ruling or prevented appellant from properly presenting case on appeal). The record does not indicate, and Jean does not claim, that she had additional evidence that was not available to the trial court from the written pleadings before it at the time of the ruling. The trial court's alleged failure to provide reasonable notice did not prevent Jean from presenting her case on appeal; she has made the same argument, based on the same evidence, as she did below. Jean has not shown how the ruling would have been different had the trial court provided her with reasonable notice.

We overrule Jean's second issue.

## B. Temporary Injunction

### 1. Standard of Review

We review a trial court's order granting or denying a temporary injunction for clear abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Tanguy v. Laux*, 259 S.W.3d 851, 856 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The trial court has broad discretion in determining whether

the pleadings and evidence support a temporary injunction. *Intercontinental Terminals Co. v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 898 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in the light most favorable to the trial court's order. *Tanguy*, 259 S.W.3d at 856.

The trial court abuses its discretion when it misapplies the law to established facts or when it concludes the applicant has a probable right of recovery and the conclusion is not reasonably supported by the evidence. *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 692 (Tex. App.—Houston [1st Dist.] 2003, no pet.). A trial court does not abuse its discretion if it hears conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Tanguy*, 259 S.W.3d at 856.

## 2. Applicable Law

A temporary injunction is an extraordinary remedy, the purpose of which is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru*, 84 S.W.3d at 204; *Tanguy*, 259 S.W.3d at 856–57. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204; *Tanguy*, 259 S.W.3d at 857. The temporary injunction applicant

16

bears the initial burden of proof—*i.e.*, he or she must offer some evidence of each of these elements. *Intercontinental Terminals*, 354 S.W.3d at 891.

The applicant shows a probable right of recovery "by alleging a cause of action and presenting evidence that tends to sustain it." *Tanguy*, 259 S.W.3d at 857). The applicant "need not establish that it will finally prevail in the litigation, but it must, at the very least, present some evidence that, under the applicable rules of law, tends to support its cause of action." *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 848 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Ahmed*, 99 S.W.3d at 692 ("In establishing a probable right to the relief sought, the applicant need not establish that it will prevail at trial.").

To establish an irreparable injury, the applicant must show that he or she has no adequate remedy at law. *Ahmed*, 99 S.W.3d at 692. A legal remedy is adequate if it "is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief." *Id.* If the damages cannot be calculated or recovered from the defendant, there is no adequate remedy at law. *Tex. Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ).

### 3.    Compliance with Rule 683

In her third issue, Jean argues that the temporary injunction order is void because it does not "set forth the reasons for its issuance" as required by Texas Rule of Civil Procedure 683.  We disagree.

Under Rule 683, an order granting a temporary injunction must "set forth the reasons for its issuance . . . ."  TEX. R. CIV. P. 683.  To satisfy this requirement, the order must provide "[a]n explanation of the pending harm to the temporary injunction applicant . . . ."  *Intercontinental Terminals*, 354 S.W.3d at 899 (citing *Transp. Co. of Tex. v. Robertson Transps. Inc.*, 152 Tex. 551, 261 S.W.2d 549, 552 (Tex. 1953)).  If the order fails to do so, the injunction is void.  *Id.* ("In the temporary injunction context, this Court has held that failure to comply with Rule 683 renders an injunction void.").

Here, the temporary injunction order states, in relevant part, that:

> [U]nless OLIVE JEAN LAWRENCE and LISA RABREN are enjoined . . . while the underlying suit is being resolved, the status quo will be altered and it will make ineffectual a judgment in favor of Plaintiff, on behalf of Olive Jean Lawrence, and Plaintiff will be without adequate remedy at law because Plaintiff's interest, on behalf of Olive Jean Lawrence, in the assets will be impaired unless safeguards are put in place to protect such interests.

Thus, the temporary injunction order does set forth the reason for its issuance—*i.e.,* to prevent the impairment of Cheryl's interest in protecting Jean's assets.  Without a temporary injunction, Jean and Lisa will further diminish and

18

encumber Jean's assets, which, in turn, will compromise Cheryl's ability to care for Jean in the event Cheryl is appointed as Jean's guardian.

Jean maintains that the temporary injunction is still void because the impairment of Cheryl's interest in Jean's estate is not an injury that is irreparable. According to Jean, the injury is one for which Cheryl could be adequately compensated with monetary damages recovered in a suit against Lisa. *See Butnaru*, 84 S.W.3d at 204 (applicant must plead and prove irreparable injury). Again, we disagree.

Recovering monetary damages from Lisa in a separate lawsuit is not "as complete, practical, and efficient to the ends of justice and its prompt administration as" simply enjoining Jean and Lisa in this guardianship proceeding. *See Ahmed*, 99 S.W.3d at 692. Indeed, the evidence of Lisa's reliance on Jean for financial aid suggests Cheryl would not be able to enforce a favorable judgment against Lisa.

A trial court may issue a temporary injunction to safeguard a litigant's alleged rights to property pending trial on the merits. *See Onoray Davis Trucking Co., Inc. v. Lewis*, 635 S.W.2d 622, 624 (Tex. App.—Houston [14th Dist.] 1982, writ dism'd) ("'[T]he probate court has the power to prevent the transfer or dissipation of the potential assets by injunctive relief.'"); *cf. Vannerson v. Vannerson*, 857 S.W.2d 659, 674 (Tex. App.—Houston [1st Dist.] 1993, writ

denied) (stating that trial court may issue temporary injunction to safeguard "*all real and personal property subject to distribution in the course of a divorce, whether that property is ultimately found to be community property or separate property*"). In a guardianship proceeding such as this one, it is reasonable to temporarily enjoin the proposed ward from self-harming conduct.

We overrule Jean's third issue.

### 4.    Sufficiency of the Evidence

In her fourth issue, Jean argues that the trial court abused its discretion by finding Cheryl had a probable right to recovery because Cheryl failed to offer certain evidence in support of her temporary injunction application. Specifically, Jean contends that Cheryl was required to support her application with (1) a physician's letter satisfying the requirements of Texas Estates Code section 1101.103, and (2) evidence that Jean's estate planning documents "were void, voidable, or insufficient to protect Jean's interests." According to Jean, Cheryl was required to offer such evidence to prove that "a guardianship is medically necessary" and that "alternatives to guardianship are not available to protect Jean's interests."

Under Texas Estates Code section 1101.103, a trial court "may not grant an application to create a guardianship for an incapacitated person . . . unless the applicant presents to the court a written letter or certificate from a physician

licensed in this state . . . ." TEX. EST. CODE ANN. § 1101.103(a) (West 2016). And under section 1101.101, a trial court must make certain findings before granting such an application, including a finding that "alternatives to guardianship that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible."[5] *Id.* § 1101.101(a)(1)(D) (West 2016).

Thus, Cheryl must produce "a written letter or certificate from a physician" and prove that "alternatives to guardianship" are not feasible to ultimately prevail on her guardianship application. *See id.* §§ 1101.101(a)(1)(D), .103(a) (West 2016). But, she was not required to produce such evidence to demonstrate a probable right to recovery. To demonstrate a probable right to recovery, Cheryl needed only to present "some evidence" that "tend[ed] to support" her guardianship application. *INEOS Grp.*, 312 S.W.3d at 848; *Ahmed*, 99 S.W.3d at 692.

The record before us reflects that Cheryl met her burden: She produced some evidence tending to support her guardianship application.

Cheryl offered evidence of Jean's incapacity. Cheryl testified that Jean suffers from short-term and long-term memory loss, tends to become confused in

---

[5] The trial court must also find that "supports and services available to the proposed ward that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible . . . ." TEX. EST. CODE ANN. § 1101.101(a)(1)(E) (West 2016).

21

unfamiliar environments, cannot manage her finances or administer her own medications, and requires live-in help.

Cheryl also offered evidence of financial exploitation of Jean by Lisa. Cheryl testified that Jean has provided Lisa and her family hundreds of thousands of dollars over the past several years. She presented the trial court with numerous checks from Jean's bank account made payable to Lisa, some of which were written in Lisa's handwriting. And she presented a recording of a phone conversation in which Lisa impersonated Jean in order to sell Jean's stock.

Further, Cheryl presented evidence that Lisa moved to Georgia with Jean to avoid the guardianship proceedings in Texas and to continue spending Jean's funds on herself and her family. For example, Cheryl presented an e-mail in which Lisa falsely confirmed that Jean would return from Georgia on January 2, 2016. Cheryl presented financial records showing that half of Jean's remaining stock was sold after Cheryl notified the police that Jean was missing. And Cheryl testified that the court-ordered accounting of Jean's assets revealed that Jean had written a check for "earnest money" for real property in Georgia.

Cheryl also presented Pavlicek's report, which provided further evidence of both Jean's lack of capacity and Lisa's exploitation of Jean. Pavlicek reported that over $145,000.00 of Jean's stock had been sold since May 2014, Jean did not know the balances of her bank accounts or how much stock she owns, and Jean was

22

unaware of how much money she had given Lisa over the past year. The report stated that Jean claimed she was not in the process of buying a house and had not signed powers of attorney, despite the evidence indicating otherwise.

Based on all of the evidence, we conclude that Cheryl presented some evidence tending to support her guardianship application. *See Tanguy*, 259 S.W.3d at 857 (citing *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.)).

We overrule Jean's fourth issue.

In her fifth issue, Jean contends that the trial court's finding that Cheryl showed a probable right to recovery was not supported by factually sufficient evidence. We have already concluded that Cheryl presented some evidence tending to support her guardianship application. *See INEOS Grp.*, 312 S.W.3d at 848 (applicant must "present some evidence that, under the applicable rules of law, tends to support its cause of action"). Therefore, we overrule Jean's fifth issue.

### Conclusion

We affirm the trial court's orders denying the special appearance and issuing the temporary injunction.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.

23