Opinion issued March 10, 2022



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-21-00089-CV

_____

**TASF, LLC D/B/A TURNAROUND SPECIAL FORCES, LLC, EDDIE GARZA, CLINT DEWISPELAERE, ALEX CASTILLO AND JOHN RUFF,** Appellants

**V.**

**TURN2 SPECIALTY COMPANIES, LLC AND TURN2 WORKFORCE SOLUTIONS, LLC,** Appellees

---

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2020-80734

---

## MEMORANDUM OPINION

This is an appeal from a temporary injunction. Turn2Specialty Companies

("Turn2 Specialty") and its wholly owned subsidiary Turn2 Workforce Solutions,

LLC ("Workforce Solutions") alleged that three former employees gave appellant Eddie Garza proprietary information relating to pay rates, billing rates, equipment costs, and vendors used at the Formosa Plastics Company in Point Comfort, Texas. Turn2 Specialty and Workforce Solutions (collectively "Turn2") allege that the information furthered the formation and operation of Garza's competing business, TASF, LLC d/b/a Turnaround Special Forces, LLC. Turn2 alleged that the information given to Garza constituted trade secrets, and it sought a temporary injunction to prevent the appellants from using the information.

The trial court entered a temporary injunction that, among other things, prohibited the appellants (1) from using the appellees' "proprietary, confidential, or trade secret information," (2) from entering into any new contracts to perform work at Formosa Plastics Company in Point Comfort, and (3) from working as a subcontractor at Formosa Plastics Company in Point Comfort unless working for a contractor that had an existing contract before the date of the temporary injunction.

The appellants raise five issues on appeal. The first issue challenges the part of the temporary injunction that restrained their ability to enter into contracts with Formosa Plastics Company in Point Comfort as overly broad. The second issue contends that the temporary injunction did not identify the protected trade secrets with sufficient specificity to allow compliance. The third through fifth issues argue

2

that the evidence was insufficient to support the elements necessary to prove that the allegedly misappropriated information constituted trade secrets.

While this appeal was pending, the trial court entered an order modifying the temporary injunction, providing that the restrictions on working at Formosa Plastics Company in Point Comfort expired at 11:59 p.m. on November 18, 2021.

We overrule the third through fifth issues because the trial court's exercise of discretion was supported by evidence. We overrule the first issue because it is moot in light of the trial court's order modifying the temporary injunction. Finally, we sustain the second issue in part, and modify the temporary injunction to clarify which categories of trade secrets are subject to the injunction. As modified, we affirm the order of the trial court.

**Background**

## I.    Turnaround services industry

All of the parties to this appeal are in the business of providing services to petrochemical and other manufacturing plants, primarily during "turnarounds," which are planned outages when maintenance, repair, and construction are conducted. Before a turnaround, the plant owner identifies jobs to be conducted and solicits bids from contractors, who have been prequalified to work at the plant based on factors such as safety, quality assurance, financial security, insurance, and reputation in the industry. The prequalification process ordinarily requires

3

contractors to submit three years' history demonstrating compliance with plant standards.

Prequalified contractors are invited to submit bids on jobs identified by the plant. The bids are based on an estimation of time, manpower, and materials needed to complete the job. This estimation requires consideration of the type of craft workers needed to perform the services, compensation including overtime, and the amount of per diem for traveling workers. The contractors commonly determine their billing rates by marking up a base rate of pay to account for factors such as overhead, withholdings, taxes, insurance, employer-paid benefits, and a profit margin. Plants award contracts for individual jobs, which are based on a specific scope of work, and blanket contracts, which allow the contractor to accept work based on rates that are locked-in for a period of time.

## II.    Events leading up to the underlying lawsuit

Eddie Garza operated a welding and piping services company, Turnaround Welding Services ("TWS"). Ownership of TWS changed hands, and in 2018 Garza left the company with a two-year covenant not to compete. Around that time, Garza approached Joe Vardell, a longtime colleague in the welding and turnaround industry. In 2018, Vardell had emerged from retirement and, with partners David Herzog and Stanley Martin, founded Epic Specialty Companies ("Epic"). Epic acquired two related companies, WHM Custom Services and WHM Custom

4

Catalyst (collectively, "WHM"). Soon thereafter, Epic changed its name to Turn2 Specialty Companies. Turn2 Specialty owned Turn2 Workforce Solutions. By 2019, Turn2, a turnaround services company, had approximately 1700 employees and generated revenues in excess of $300 million per year.

When Garza approached Vardell in 2018, he recommended three of his top TWS employees: Clint Dewispelaere, Alex Castillo, and John Ruff. Like Garza and Vardell, all three men had started their careers as welders. Over time and with experience, Dewispelaere, Castillo, and Ruff became project managers. In 2018, Turn2 hired Dewispelaere, Castillo, and Ruff into the specialty welding group as project managers. Each man testified that he accepted the job with Turn2 because he believed that Garza would be joining Turn2 when the covenant not to compete expired in September 2020. All three men were assigned to work on jobs at Formosa.

Garza testified that he had hoped to join Turn2, but when it became clear to him that Turn2 was not interested in working with him, he began preparing to open his own turnaround welding services company, TASF. In the summer of 2020, Garza began talking to Dewispelaere, Castillo, and Ruff about his new venture and possible positions for them. According to all four men, no job offers were made or accepted while Dewispelaere, Castillo, and Ruff worked for Turn2. Nevertheless, between August and October 2020, Dewispelaere, Castillo, and Ruff each provided

5

Garza with information they believed would be helpful as TASF prepared to begin operating.

At a social event, Ruff spoke with a Formosa manager with whom he had become friendly. Ruff told the manager about TASF and that he was considering leaving Turn2 to work for TASF. Ruff also inquired about the prequalification process. The Formosa manager later emailed Ruff the prequalification package, along with advice on how to track the progress and an offer to help once TASF had paperwork to submit. On August 28, 2020, Ruff forwarded the email and attachment to Dewispelaere because Ruff knew he communicated with Garza frequently.

On September 5, 2020, Dewispelaere sent Garza an email with a subject line of "Good Morning." Attached to this email was the "9C-WHM" blanket contract between WHM—Turn2's predecessor—and Formosa for work in four units at the plant. A spreadsheet showing pay rates and billing rates for various craft categories was also attached to the email. Included as part of the contract was a string of emails and a redlined document showing the parties' negotiation of final terms. This document stated:

> [Time] & [Materials] General Requirements Check List
>
> Contractor to agree with all these items and include related costs within T&M rates.
>
> . . .

3.  Overtime is paid after forty (40) hours worked per week, after ten (10) hours per shift. It shall be noted that Startup and Commissioning related work can be 24 hours 7 days a week and not every hour worked over 10 hours in a day can be overtime [OT]. OT shall be applied to per shift/per person worked after 10 hours per shift. Saturdays and Sundays are not mandatory overtime unless it qualifies through above OT definition.

On September 8, 2020, Castillo sent Garza an email with a subject line of "Formosa Rates." Attached to this email were: (1) the rate sheet for a Turn2 job at Formosa, Job No. 2001623, and (2) WHM's 2019 Billing Rate Sheet, a seven-page document, which included details regarding overtime, travel, schedule, taxes, reimbursement, and other factors relevant to the wage billing rate and equipment lease rates. The 2019 Billing Rate Sheet had a footer that stated: "WHM Custom Services Inc. 2019. Confidential. All Rights Reserved."

In September 2020, Garza formed TASF, LLC, which he owned jointly with KWN Enterprises ("KWN").[1] KWN holds an ownership interest in a family of specialty and general contractor companies that perform turnaround services in Texas and Louisiana. KWN also owned Tower Force, which specialized in work on pressure vessels. Keith Hurst, the president of Tower Force and president and chief executive officer of KWN, testified that he helped Garza with the formation of TASF by providing information and office support needed to become prequalified at Formosa and to develop billing rates. Garza maintains that he

---

[1]  Garza has an ownership interest in KWN.

7

developed his billing rates in September 2020 based on his knowledge of industry pay rates and information provided by Hurst, without regard to the unsolicited information he received from Castillo and Dewispelaere regarding Turn2. Garza applied for and obtained prequalification with Formosa in September 2020.

On October 5, 2020, Dewispelaere sent Garza an email regarding "Vendor List." Attached to this email was a list of vendors approved by Formosa, including names and phone numbers of sales contacts. Castillo maintained that he and a subordinate created this list based on vendors they saw working at Formosa, but he admitted that they created it while they were employed by Turn2.

On October 9, 2020, Dewispelaere sent Garza an email transmitting a rate sheet comparison that compared TASF and Turn2 contract rates for 52 different craft worker classifications. It included columns showing the difference between the two companies' rates for regular pay, overtime, and per diem. Five days later Dewispelaere sent an email to Mitch McBride, a manager at Formosa, from his Turn2 email account. Dewispelaere wrote: "I told you we were starting a new company. Well, we are now an approved vendor in Formosa." He then explained how Castillo and Ruff and their crews could help Formosa complete ongoing projects.

On October 14, 2020, Garza forwarded to Dewispelaere a document he said Castillo had worked on, called: "FPC-TAS Force Terms and Conditions." This

document included a section called "Classification Hourly and Per Diem Rates." In that section was a table listing craft worker classifications with columns for "straight time wage" (regular pay), overtime wage, overtime premium wage, and per diem. In "Overtime Rules" the document stated: "Overtime is paid after forty (40) hours worked per week, after (10) hours per shift, Saturday, Sunday, and Contractor Holidays." The document also included daily, weekly, and monthly equipment rental rates.

The next day, October 15, 2020, Dewispelaere sent Garza an email with a subject line of "Rate Sheet with T&C." The "Classification and Hourly Per Diem Rates" had been revised to eliminate the "overtime premium wage column." Some of the rates also became closer to the Turn2 contract rates from the 9C-WHM contract, which were used in the comparison Dewispelaere sent Garza on October 9, 2020. The "Overtime Rules" section was revised to eliminate the requirement to pay overtime on Saturday and Sunday. Most equipment rates were also revised to provide only daily or hourly rental rates. About an hour after Dewispelaere sent this email to Garza, he sent Garza another email with a subject of "Ours vs Theirs." Dewispelaere attached a chart comparing "Our Rate sheet vs Turn2." He explained that the red highlighting indicated TASF rates higher than Turn2 rates and green highlighting indicated TASF rates lower than Turn2 rates.

On October 23, 2020, Garza sent Formosa an estimate for TASF to commission a unit at the plant. Other emails indicate that Dewispelaere and Castillo contributed to the estimate.

On November 15, 2020, while resolving an internet connectivity issue, Daniel Barnett, Turn2's information technology manager, saw the "Ours vs Theirs" email, which was open in a web browser on Dewispelaere's laptop. Turn2 began an investigation, and Dewispelaere, Castillo, and Ruff were terminated that month.

## III.  The lawsuit

In December 2020, Turn2 filed suit against TASF, Garza, Dewispelaere, Castillo, and Ruff.[2] Turn2 alleged causes of action for breach of fiduciary duty (Dewispelaere, Castillo, and Ruff), aiding and abetting breach of fiduciary duty (TASF and Garza), misappropriation of trade secrets under the Texas Uniform Trade Secrets Act (Dewispelaere, TASF, and Garza), violations of the Texas Theft Liability Act by taking trade secrets (Dewispelaere, TASF, and Garza), civil conspiracy, and tortious interference with a contract. They sought injunctive relief and monetary damages. The trial court granted a temporary restraining order, as to which this court denied mandamus relief. *See In re TASF, LLC*, No. 01-20-00853-

---

[2]  Turn2 also initially sued Enriqueta Diosdado, but it nonsuited her after learning through discovery that she had no relationship to the facts of this case.

CV, 2020 WL 7776081, at *1 (Tex. App.—Houston [1st Dist.] Dec. 30, 2020, orig. proceeding) (mem. op.).

## IV. Temporary injunction

The trial court conducted an eight-day hearing on the application for a temporary injunction. The trial court heard evidence regarding the events that led to the lawsuit. Several detailed comparison spreadsheets were introduced into evidence, and Clayton and others compared rates and contract terms used by TASF in its drafts and bids to rates and contract terms in documents forwarded to Garza by Dewispelaere and Castillo. Based on these comparisons, Clayton testified that TASF changed their rates after they received Turn2 information. He said:

> So they took our terms and conditions, our rate sheets . . . . So I believe they have taken our markups, manipulated them to be in their benefit. . . . straight time, overtime . . . copied [our] per diem rates of 125 a day we negotiated . . . . They were able to get the double time into the overtime column just like we did. . . . they removed the Saturday and Sunday from their terms just like ours. . . . They changed their lunch breaks to match ours. . . . Equipment rates to match our daily rates.

He later also testified that the appellants misappropriated a vendor list.

Clayton testified that he began working for WHM in 2001, and he had been cultivating a relationship with Formosa since 2005. According to Clayton, despite ongoing efforts to become prequalified, Turn2 only first became prequalified at Formosa in 2013. From 2013 through 2018, Turn2 bid on and won several bids for individual jobs. In 2018, Turn2 was awarded its first blanket subcontract at

11

Formosa. Clayton testified that Turn2's rates, terms, and conditions were negotiated with Formosa over a long period of time.

Both Clayton and Vardell testified that the rates, terms, and conditions that they had negotiated over the years were valuable to the company. First, Turn2 had negotiated for higher per diem rates for traveling workers and higher rates for senior project managers, both of which helped Turn2 attract talented workers. Vardell testified that in 2019 and 2020, Turn2 had a total revenue just over $300 million, with about half of that coming from work at Formosa. Clayton and Vardell considered their confidential information and relationship with Formosa to be a valuable competitive advantage because of the time Turn2 invested to develop the relationship and negotiate rates. They conceded, however, that rates used in a bid proposal are just one of many factors that may influence a plant to accept a bid. Other factors include total man-hours, total cost, safe-work history, history of on-time delivery, and reputation for high quality work.

Clayton also testified that Turn2 took measures to protect its confidential information. Access to contracts was limited to upper management, which was about 18 to 20 people out of a workforce of approximately 1700 people. In December 2019, Turn2 implemented a procedure to further safeguard the contracts by keeping them in a shared electronic file to which access was restricted to upper management. Other employees who needed access to a contract for job-related

purposes could obtain a contract from a person who had access. For example, Clayton testified that he gave a copy of the 9C-WHM contract to Castillo in 2018. Clayton also testified that whenever he shared a contract or contract rates with an employee, he said: "Don't share it with anyone." Clayton said that he expected employees to know that information created by Turn2 for use in its business was confidential and only for internal use. He did, however, add a footer to the WHM Custom Services Inc. 2019 Billing Rate Sheet that stated: "WHM Custom Services Inc. 2019, Confidential, All Rights Reserved." In addition to the contracts themselves, contractual rate information was stored in an internal database called Mach 1, which was used for human resources management, project management, and accounting. About 10% of the total workforce, including timekeepers and project managers, had access to Mach 1. Mach 1 could only be accessed with an employee's unique password, and access to Mach 1 was restricted by job function to only the information needed by that employee. Clayton acknowledged, however, that information from Mach 1 could easily be exported to email and no controls had been implemented to ensure that employees kept information confidential when they gained access to contracts or pay rates in a manner other than direct access to the shared file or Mach 1. Both Clayton and Vardell conceded that there were no non-disclosure agreements in place during the time when Dewispelaere, Castillo, and Ruff worked for Turn2.

Dewispelaere and Castillo maintained that they did not obtain the challenged information from the shared file or from Mach 1. They said they obtained the information from emails or hard copies given to them by other employees and by direct observation of vendors present at Formosa. Dewispelaere, Castillo, Ruff, Garza, and Hurst all testified that pay rates are common knowledge and not proprietary because they are known throughout the industry by craft workers and contractors. They testified about factors other than pay rate or billing rate that may influence whether a particular contractor is awarded a bid and about the relationship between billing rates and man-hours in the total cost of a project. Garza testified that he did not rely on information from Dewispelaere or Castillo when determining pay rates and billing rates, though he acknowledged he had the information. He testified that his only prior business with Formosa was through his radio rental business, Signal 2 Way Radio. The evidence showed that although it took Turn 2 eight years to become prequalified at Formosa and fifteen years to be awarded a blanket subcontract, TASF became prequalified in less than a month.

After hearing evidence and considering the parties' briefs, the trial court entered a temporary injunction, in which it found:

Plaintiffs own certain proprietary confidential information that is important to its business operations and that access to same is limited and protected from public disclosure or use;

Plaintiffs disclosed its confidential information to certain of the Defendants for their use in carrying out business on Plaintiffs' behalf;

14

Defendants knew that Plaintiffs did not intend its proprietary information to be disseminated;

Defendants have used Plaintiffs proprietary confidential information, including but not limited to confidential base wage, billing rate, per diem, contract terms and conditions, and vendor contract and approval information, in competition with Plaintiffs and in assisting others to compete, with such use constituting unfair competition;

If not restrained, Defendants will, in all likelihood, continue their actions against Plaintiffs, which will probably cause immediate and irreparable injury to the Plaintiffs, including loss of goodwill and other damages that cannot be measured by an pecuniary standard and because an award of damages may come too late; and

There is a probable likelihood that, unless restrained, Defendants may destroy or remove relevant documents or other evidence during the pendency of this matter.

The temporary injunction restrained and enjoined the appellants from:

[1.] Destroying, altering, hiding or transferring possession by any means any tangible or electronically stored documents, text messages, e-mails, electronic files, spreadsheets, databases relating to the Plaintiffs, their business, business practices, procedures, clients, past and pending contracts, contacts, and correspondence;

[2.] Accessing, disclosing, using, transferring, selling, conveying or sharing in any form (including summarizing or paraphrasing same) any of Plaintiff's proprietary confidential or trade secret information, including but not limited to confidential base wage, billing rate, per diem, contract terms and conditions, and vendor contact and approval information;

[3.] With the exception of radio rentals provided by Signal Two-Way Radio [a separate business owned by Garza], soliciting or entering into any new contract following the date of this Order to perform turnaround work at the Formosa Plastics facility in Point Comfort, Texas ("Formosa Plastics");

[4.] Doing any work as a subcontractor at the Formosa Plastics facility in Point Comfort, Texas for any contractor except for a contractor that had any existing contract with Formosa Plastics prior to February 2, 2021.

## Analysis

In five issues, the appellants assert that the trial court abused its discretion by issuing a temporary injunction (issues 3–5), by issuing an overly broad temporary injunction (issue 1), and by issuing a vague temporary injunction (issue 2).

## II.    Standards of Review

### A.    Temporary Injunction

In general, "[a] temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (per curiam) (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam)). "The function of a preliminary injunction is to maintain the status quo rather than adjudicate the matter on the merits." *In re M-I L.L.C.*, 505 S.W.3d 569, 576 (Tex. 2016); *see Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "The 'status quo' is the 'last, actual, peaceable, non-contested status which preceded the pending controversy.'" *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016) (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004)).

"The party applying for a temporary injunction 'must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.'" *Abbott*, 610 S.W.3d at 916 (quoting *Butnaru*, 84 S.W.3d 198, 204 (Tex. 2002)). The applicant has the burden to establish each element. *Abbott*, 610 S.W.3d at 916. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204.

At a hearing on an application for a temporary injunction, "the applicant is not required to establish that she will prevail on final trial . . . the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits." *Walling*, 863 S.W.2d at 58. An applicant can show a probable right to relief by demonstrating that he is likely to succeed on final determination of the merits. *See Abbott*, 610 S.W.3d at 916. "To show a probable right of recovery, an applicant need not establish that it will finally prevail in the litigation, but it must, at the very least, present some evidence that, under the applicable rules of law, tends to support its cause of action." *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 848 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also Tanguy v. Laux*, 259 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("A probable right to the relief

17

sought is shown by alleging a cause of action and presenting evidence that tends to sustain it.").

## B.  Abuse of discretion

We review a trial court's order granting a temporary injunction for an abuse of discretion. *Abbott*, 610 S.W.3d at 916. *Cf.* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4) (authorizing interlocutory appeal from order that grants or refuses a temporary injunction). We review the evidence in the light most favorable to the trial court's ruling, draw all legitimate inferences from the evidence, and defer to the trial court's resolution of conflicting evidence. *INEOS Grp. Ltd.*, 312 S.W.3d at 848. "Abuse of discretion does not exist if the trial court heard conflicting evidence, and evidence appears in the record that reasonably supports the trial court's decision." *Id.*

Rule 683 of the Texas Rules of Civil Procedure sets out the requirements for a temporary injunction:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

> Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate

18

relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

TEX. R. CIV. P. 683. "The purpose of the rule is to adequately inform the enjoined party of what he is enjoined from doing and the reason why he is enjoined." *Wright v. Liming*, No. 01-19-00060-CV, 2019 WL 3418516, at *4 (Tex. App.—Houston [1st Dist.] July 30, 2019, no pet.) (mem. op.); *In re Chaumette*, 456 S.W.3d 299, 305 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Injunctions must be narrowly drawn and not "so broad as to enjoin a defendant from activities which are a lawful and proper exercise of his rights." *Holubec v. Brandenberger*, 111 S.W.3d 32, 39–40 (Tex. 2003).

## C.    Trade Secrets

The Texas Uniform Trade Secrets Act ("TUTSA") defines "trade secret" as:

> all forms and types of information, including business . . . economic . . . and any . . . compilation . . . if: (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and (B) the information derives independent economical value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6). This standard requires that the owner of the trade secret take reasonable measures but does not require proof that the alleged trade secrets have been held in absolute secrecy in order to establish the existence of a trade secret or that information is worthy of trade secret protection

19

pending final resolution on the merits. *See HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 266 (Tex. 2021).

Under TUTSA, "[a]ctual or threatened misappropriation may be enjoined if the order does not prohibit a person from using general knowledge, skill, and experience that person acquired during employment." TEX. CIV. PRAC. & REM. CODE §134A.003(a). The statutory definition of misappropriation includes the "use of a trade secret of another without express or implied consent" by a person who "at the time of . . . use, knew or had reason to know" that his "knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret . . . ." *Id.* § 134A.002(3)(B)(ii)(b). It is also misappropriation for a trade secret to be disclosed or used by someone who obtained the information from "a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret." *Id.* § 134A.002(3)(B)(ii)(c).

TUTSA provides for monetary damages "[i]n addition to or in lieu of injunctive relief" for misappropriation of trade secrets. *Id.* § 134A.004(a). TUTSA requires a court to "preserve the secrecy of an alleged trade secret by reasonable means." *Id.* § 134A.006(a). Finally, TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *Id.* § 134A.007(a).

20

**III. The allegedly misappropriated information was deserving of trade secret protection until a determination on the merits can be made.**

In issues three through five, the appellants challenge the issuance of the temporary injunction. They assert that the information that was allegedly misappropriated did not warrant trade secret protection because Turn2 did not demonstrate that the information met the statutory requirements to be trade secrets under TUTSA. In particular, they challenge three elements that must be proven to demonstrate that information is a trade secret under TUTSA: (1) the plaintiff alleging misappropriation of a trade secret must be the owner of the alleged trade secret; (2) the plaintiff must have taken steps that were reasonable under the circumstances to maintain secrecy; and (3) the alleged trade secret must "derive[] independent economical value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

**A. Turn2 Specialty is the owner of the alleged trade secrets.**

In their fourth issue, the appellants ask whether "the evidence was sufficient to show Turn2 Specialty Companies and not Formosa owned the alleged trade secrets contained in the WHM blanket contract." They assert that the contract language assigns ownership of Turn2's rate information to Formosa. We disagree.

"Interpretation of a contract involves questions of law we consider de novo." *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021) (citing

21

*URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018)). "[O]ur primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)). "We ascertain that intent by giving words the meaning a reasonable person would afford them under the circumstances and by construing them within the contractual context as a whole, not in isolation." *Northland Indus., Inc. v. Kouba*, 620 S.W.3d 411, 415 (Tex. 2020).

The appellants contend that the 9C-WHM contract's definitions of "owner," "work," and "confidential information" together demonstrate that all information about Turn2 Specialty's work—including billing and pay rates—belongs to Formosa. The cover page states in several places that the 9C-WHM contract is "between Owner and Contractor." The contract identifies the contractor as WHM Custom Services Inc. and the "owner" as: Formosa Plastics Corp., TX; Formosa Industries Corporation; Formosa Utility Venture, LTD; and Formosa Olefins, LLC. The "Formosa Plastics Construction Contract General Terms and Conditions" defines "work" as:

> all work, services, equipment, and material required to be managed, coordinated, designed, engineered, specified, installed or supplied by Contractor under this Contract, including all management, coordination, work, services, equipment and material reasonably inferable for the performance of items necessary to carry out Contractor's obligations under the Contract.

22

"Contract" is defined as "the documents identified as composing the Contract in the Contract Summary Form." These documents include summaries of WHM's billing rates and equipment rates based on its bid for that contract and the parties' negotiation. The contract also includes a provision regarding "Confidential Information":

> Contractor is responsible to protect for a period of no less than ten (10) years from the time of completion of the Work, **any confidential Owner information which it may be entrusted with or come to discover in the execution of its Work**. Unless otherwise informed by Owner in writing, Contractor shall presume that all information in its possession including, without limitation, details about the Work, other work at the Site or otherwise on Owner's property is confidential information of Owner. Failure to meet the above shall constitute a material breach hereunder. (Emphasis added.)

The appellants assert that Formosa is the "owner of the Contract and information contained therein," to the exclusion of Turn2 Specialty, and that Formosa is therefore the owner of Turn2 Specialty's billing and pay rates. The appellants maintain that "WHM contractually agreed that all confidential information in the WHM Contract belonged to the contract Owner."

But no such language appears in the 9C-WHM contract. Rather, the information that the contractor must keep confidential for ten years is information that belongs to Formosa and which is entrusted to the contractor during the course of performance of the contract or which the contractor discovers while performing the contract. Formosa did not entrust WHM with information regarding its

business practices. Information about WHM's pay rates, billing rates that account for internal calculations reflecting other business costs, and what WHM charges for equipment was neither entrusted to nor discovered by WHM.

Moreover, Todd Clayton, Director of Specialty Welding for Turn2 Specialty, testified that confidential information clause of the contract with Formosa referred to "bid packages" Formosa sent to contractors "with their confidential information in it, which contains their drawings, their specifications, their plant requirements." The trial court could reasonably conclude that the contract language identifying the owner referred to the owner of the premises where the work would be done. *See Elgohary*, No. 01-14-00216-CV, 2016 WL 4374918, at *8.

Finally, Turn2 maintains that four specific documents that allegedly include trade secrets were misappropriated by the appellants:

(1) the September 5, 2020 "Good morning" email;

(2) the 9C-WHM blanket contract, which was attached to the "Good Morning" email;

(3) the September 8, 2020 "Formosa Rates" email with its two attachments: the Job No. 2001623 rate sheet, and WHM's 2019 billing rate sheet, a seven-page document; and

(4) the October 5, 2020 vendor list.

Three of the four alleged trade secret documents were not part of the 9C-WHM contract. The appellants have made no argument that Turn2 does not own those trade secrets.

We overrule the fourth issue.

**B.      Turn2 took reasonable steps under the circumstances to maintain the secrecy of the allegedly misappropriated information.**

In the third issue, the appellants argue that the evidence was insufficient to support a finding that Turn2 took reasonable steps under the circumstances to maintain secrecy. "Information need not be kept absolutely secret in order to constitute a trade secret." *HouseCanary*, 622 S.W.3d at 266. Whether the owner has taken reasonable measures to keep the information secret is generally a fact-intensive determination. *See id.*

Appellants portray Stanley Martin as saying that he considered the information in the 9C-WHM contract to be confidential but not necessarily secret. The record shows that he repeatedly said the information was confidential and refused to answer questions about whether the information was a secret. Second, the appellants assert that the "confidential information, trade secrets, and contracts" of Turn2 Specialty "were accessible by virtually all employees within the company, and no specific direction was taken by company executives to keep the alleged trade secrets a secret."

To support this proposition, the appellants rely on testimony from Enriqueta Diosdado, a former Turn2 employee who had worked as a manpower coordinator. In her role, she contacted workers requested by project managers and helped them to complete the onboarding process to begin work. She testified that she logged in to Mach 1, Turn2's internal human resources and project management database, every morning as that was the primary resource that she used to complete her work. She testified that she had access to contracts through Mach 1 as they related to her job, but she did not testify that virtually all employees within the company had the same access to contracts.

The evidence showed that only about 10% of Turn2's employees had access to Mach 1, and their access was restricted to only the information needed for their jobs. Only about 20 people out of a workforce of about 1700 had access to the contracts. Clayton testified that when he had an occasion to give a copy of a contract or the rates to an employee, he warned them not to share the information with anyone. He said that he gave the 9C-WHM contract to Castillo, and that he added a footer to the attachment to the 9C-WHM contract that stated "WHM Custom Services Inc. 2019. Confidential. All Rights Reserved." The evidence showed that employees had company-issued, password-protected laptops. Access to Mach 1 required a unique employee password. And since 2019, the contracts were stored in shared filed to which only select members of upper management

26

had access. This is some evidence of a substantive and probative character that Turn2 took reasonable actions to protect the rate and contract information from disclosure to employees and the public. *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (trial court does not abuse discretion if some evidence supports decision).

The appellants, nevertheless, argue that the lack of a nondisclosure or confidentiality agreement with employees demonstrates that Turn2's actions were not reasonable under the circumstances. A claim for misappropriation of trade secrets does not require the existence of a confidentiality agreement or a nondisclosure agreement. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B)(ii)(b). A plaintiff can establish a claim for misappropriation of a trade secret by showing: (1) the existence of proprietary information or a trade secret; (2) breach of a confidential relationship or improper discovery of the information or secret; (3) unauthorized use of the information or secret; and (4) damages. *RSM Prod. Corp. v. Global Petroleum Grp., Ltd.*, 507 S.W.3d 383, 393 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Dewispelaere, Castillo, and Ruff were hired to positions of trust and confidence as highly compensated project managers with hiring authority. Dewispelaere testified that he was in a trusted role with little oversight. They were entrusted with confidential information that was needed for their work for Turn2,

27

which sometimes included recruiting workers and preparing job bids. This evidence supports a conclusion that Dewispelaere, Castillo, and Ruff had a duty to maintain the secrecy of contract information provided to them or limit its use to legitimately advancing Turn2's interests. *See T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (even absent confidentiality agreement, employee not permitted to use "confidential or proprietary information acquired during the relationship in a manner adverse to the employer").

Finally, the appellants contend that Turn2 lost the alleged trade secrets by sharing the 9C-WHM contract. The appellants assert that the 9C-WHM contract required the contractor to provide its subcontractors with a copy of the contract. The appellants contend that Turn2 Specialty shared confidential information with Wison, a subcontractor whom the appellants contend worked for Turn2 Specialty. They assert that because Turn2 Specialty shared the contract in this way, the trade secret status was lost. These arguments lack merit.

Clayton testified that Turn2 worked as Wison's subcontractor, not the other way around. And there was no evidence that Turn2 actually shared the 9C-WHM contract with anyone. Moreover, limited disclosure to others to further the economic interest of the owner of the trade secret does not destroy secrecy. *Snowhite Textile & Furnishings, Inc. v. Innvision Hosp., Inc.*, No. 05-18-01447-

28

CV, 2020 WL 7332677, at *5 (Tex. App.—Dallas Dec. 14, 2020, no pet.) (mem. op.); *see Lamont v. Vaquillas Energy Lopeno, Ltd., LLP*, 421 S.W.3d 198, 212 (Tex. App.—San Antonio 2013, no pet.) ("Trade secret status is not destroyed simply by showing the protected item to prospective buyers, customers, or licensees."); *see also Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991) ("If a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained.").

We conclude that the trial court did not abuse its discretion by determining that Turn2 took reasonable steps under the circumstances to protect the secrecy of the allegedly misappropriated information. *See Unifund CCR Partners*, 299 S.W.3d at 97.

We overrule the third issue.

### C. The allegedly misappropriated information was economically valuable.

In their fifth issue, the appellants contend that Turn2 did not demonstrate that the information deserved trade secret protection because the vendor list, rates, and terms and conditions are readily ascertainable through other proper means.

The evidence conflicted about the vendor list. Clayton testified that Turn2 keeps an updated list of vendors who are approved to work at Formosa. He

29

acknowledged that all vendors are equally available to contractors in the industry, and that he did not know who created the list that was sent to Garza. Castillo testified that he created the list, and forensic analysis of the computer file demonstrated that the last user to work on the vendor list sent to Garza was a man who had directly reported to Castillo.

A compilation of business information can be considered a trade secret under TUTSA if the secrecy and economic value conditions in the statute are satisfied. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6). In light of the testimony, the trial court as factfinder could have believed that the list sent to Garza was either the same as the Turn2 vendor list or created based on the information on the Turn2 vendor list. Although the appellants argue that "[a]ny contractor can approach a facility owner and request the list of approved vendors," there was no evidence adduced at the eight-day temporary injunction hearing that Formosa kept such a list and readily distributed it to contractors seeking to bid on jobs at the plant.

The appellants also assert that any trade secret status associated with the 9C-WHM contract was lost when Turn2 shared the contract with subcontractors because doing so made the contract readily ascertainable to others through proper means. We have already explained the flawed logic in this argument.

Finally, the appellants state: "Rates and terms and conditions are readily ascertainable information through proper means." But they do not identify any evidence that demonstrates that the rates, terms, and conditions that Turn2 asserts deserve trade secret protection actually are readily ascertainable by others who would gain an economic benefit from them. Instead, the appellants argue that ultimately the rates, terms, and conditions in any contract with Formosa are dictated by Formosa. This is an argument about the merits of the case and the existence of proof of actual damages.

Clayton and Vardell both testified that Turn2 spent many years cultivating a relationship with Formosa, bidding on jobs, and eventually negotiating a mutually agreeable set of rates, terms, and conditions that allowed Turn2 to profit by its work and successfully bid on jobs at the plant. Vardell testified that work at Formosa constituted half of Turn2's revenues, which exceeded $300 million in each of 2019 and 2020. Clayton testified that the allegedly misappropriated information would allow another contractor to reverse engineer their overhead and profit margin. Clayton also testified that this information could allow another contractor to undercut Turn2 in future bid proposals and that it appeared, based on his comparisons, that TASF had set its rates to do exactly that. The trial court as factfinder could rely on this evidence to find that the allegedly misappropriated information "derive[d] independent economic value, actual or potential, from not

31

being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(B).

We overrule the fifth issue.

* * *

We conclude that the trial court did not abuse its discretion by determining that the allegedly misappropriated information deserved trade secret protection pending trial on the merits.

## IV. The temporary injunction lacks sufficient specificity.

Having concluded that the issuance of a temporary injunction was not an abuse of discretion, we now consider the appellants' arguments about the scope of the injunction. In their first and second issues, the appellants contend that the temporary injunction is overly broad because it restrains them from conducting activities that are a lawful and proper exercise of their constitutional rights (issue 1) and because it does not specifically identify the trade secrets that are affected by the order (issue 2).

### A. The provision challenged by the first issue has expired.

The first issue expressly challenges the provision that prohibited TASF from "soliciting or entering into any new contract following the date of this Order to perform turnaround work at the Formosa Plastics facility in Point Comfort, Texas."

32

While this interlocutory appeal was pending, the trial court entered an order extending the temporary injunction and providing that the restrictions on working at Formosa Plastics Company in Point Comfort expired at 11:59 p.m. on November 18, 2021.

Because this provision of the temporary injunction has expired, there is no longer a live controversy between the parties, and this issue is moot. *Glassdoor, Inc. v. Andra Grp., LP*, 575 S.W.3d 523, 527 (Tex. 2019) (explaining that case becomes moot when during pendency of litigation there ceases to be a justiciable controversy between the parties). We overrule the first issue.

### B. The non-exclusivity of the list of information protected by the temporary injunction makes it indefinite.

In the second issue, the appellants challenge the provision that prohibits them from:

> Accessing, disclosing, using, transferring, selling, conveying or sharing in any form (including summarizing or paraphrasing same) any of Plaintiffs' proprietary confidential or trade secret information, **including but not limited to** confidential base wage, billing rate, per diem, contract terms and conditions, and vendor contract and approval information.

The appellants argue that this provision does not satisfy Rule 683 because it does not specifically identify the information that they are prohibited from using. They assert that because the examples are non-exclusive, they have no way to know what is prohibited.

33

We agree. The temporary injunction does not provide adequate notice of the prohibited conduct because of the non-exclusivity of the list. The restrictions on soliciting or accepting work at Formosa Plastic's Point Comfort location have expired. The appellants are "free to compete but not with the materials developed by or on behalf of" the appellees. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ). We may modify an overly broad injunction, and we do so here to eliminate the non-exclusivity of the challenged prohibition. *See T–N–T Motorsports*, 965 S.W.2d at 25 (appellate court may modify overly broad injunction). We modify the temporary injunction to eliminate and add the language as shown below.

> Accessing, disclosing, using, transferring, selling, conveying or sharing in any form (including summarizing or paraphrasing same) ~~any of~~ **the following types of** Plaintiffs' proprietary confidential or trade secret information: ~~including but not limited~~ confidential base wage **rates**, billing rate**s**, per diem **amounts**, contract terms and conditions, and vendor contract and approval information.

## Conclusion

We modify the temporary injunction and affirm as modified. All pending motions are dismissed as moot.

Peter Kelly
Justice

Panel consists of Justices Kelly, Hightower, and Farris.